**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**AMY OLIVERAS,** *individually and as parent and on behalf of the minor A.O.*; **HIRAM OLIVERAS,** *individually and as parent and on behalf of the minor A.O.*; **and A.O.,** *by The Children's Rights Initiative, Inc.*,

                              **Plaintiffs,**

        **vs.**                                          **8:11-cv-1110**
                                                         **(MAD/CFH)**

**SARANAC LAKE CENTRAL SCHOOL DISTRICT; PATRICIA KENYON,** *in her individual and official capacity as Middle School Principal of the Saranac Lack Central School District*; **GERALD GOLDMAN,** *in his individual and official capacity as Superintendent of the Saranac Lake Central School District*; **SARANAC LAKE CENTRAL SCHOOL DISTRICT BOARD OF EDUCATION; DEBRA LENNON,** *in her individual and official capacity as President of the Saranac Lake Central School District*; **JOHN DOE(S); and JANE DOE(S),**

                              **Defendants.**
_____

**APPEARANCES:**                          **OF COUNSEL:**

**GIROUARD LAW FIRM**                      **THERESA M. GIROUARD, ESQ.**
301 North Washington Street
P.O. Box 4632
Rome, New York 13442
Attorneys for Plaintiffs Amy and
Hiram Oliveras

**PERTZ & PERTZ, PLLC**                    **T. JOSIAH PERTZ, ESQ.**
12280 State Route 365
Remsen, New York 13438
Attorneys for Plaintiff A.O.

**BARTLETT, PONTIFF, STEWART & RHODES, P.C.**
One Washington Street
P.O. Box 2168
Glens Falls, New York 12801-2168
Attorneys for Defendants Saranac Lake
Central School District, Saranac Lake
Central School District Board of
Education, and Debra Lennon

**EILEEN M. HAYNES, ESQ.**
**BENJAMIN R. PRATT, JR., ESQ.**

**REHFUSS, LIGUORI & ASSOCIATES**
40 British American Blvd.
Latham, New York 12110
Attorneys for Defendant Patricia Kenyon

**STEPHEN J. REHFUSS, ESQ.**

**FISHER, BESSETTE, MULDOWNEY & HUNTER**
P.O. Box 420
43 Gold Course Road
Malone, New York 12953-0420
Attorneys for Defendant Gerald Goldman

**JOHN J. MULDOWNEY, ESQ.**

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

On September 19, 2011, Plaintiffs commenced this action pursuant to 42 U.S.C. § 1983, Title VI of the Civil Rights Act of 1964, and the New York State Human Rights Law. *See* Dkt. No. 1. Currently before the Court are Defendants' motions for summary judgment (Dkt. Nos. 60, 62 and 64) and Plaintiffs' cross motion for leave to amend their complaint/response (Dkt. No. 76).

## II. BACKGROUND[1]

Plaintiffs filed their complaint in this matter on September 19, 2011. *See* Dkt. No. 1. In their complaint, Plaintiffs raise the following seven separate causes of action against Defendants:

---

[1] To avoid confusion, anytime the Court references a specific page number for an entry on the docket, it will cite to the page number assigned by the Court's electronic filing system.

(1) Equal Protection violations due to racial discrimination brought pursuant to 42 U.S.C. § 1983;

(2) racial discrimination under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; (3)

racial discrimination pursuant to New York Human Rights Law ("NYHRL"), Executive Law §

290 *et seq.*; (4) First Amendment retaliation pursuant to 42 U.S.C. § 1983; (5) unlawful

retaliation pursuant to the NYHRL; (6) negligence based on Defendants' alleged failure to

provide Plaintiff A.O. with a safe learning environment free from bullying, racial discrimination,

and harassment; and (7) for punitive damages for Defendants' alleged gross negligence. *See* Dkt.

No. 1; *see also* Dkt. No. 73-1 at ¶ 1.[2]  Although Plaintiffs did not include any causes of action for

sexual harassment or claims of gender discrimination under Title IX or Section 1983, Plaintiffs

have cross-moved to amend their complaint to add such claims. *See* Dkt. No. 76; *see also* Dkt.

No. 73-1 at ¶ 4.  The named Defendants include Saranac Lake Central School District (the

"District" or "Saranac Lake C.S.D."), the Board of Education (the "Board"), Patricia Kenyon

(Principal of the Petrova Middle School), Gerald Goldman (Superintendent of Schools), and

Debra Lennon (President of the Board), in their individual and official capacities.

In 2007, Plaintiff A.O. moved to Saranac Lake and attended the Petrova Elementary

School as a fourth grader.  Plaintiff A.O.'s mother is Caucasian and her father is Puerto Rican.

*See* Dkt. No. 73 at ¶ 10.  As set forth in more detail below, Plaintiff A.O. contends that, when she

began attending Saranac Lake schools she was subjected to harassment and discrimination.


A.     **2008-2009 School Year: 5th Grade**

---

[2] Since the statement of material facts submitted by Defendants Saranac Lake C.S.D., the Board, and Debra Lennon provides the most comprehensive discussion of the relevant facts and because it includes the facts pertaining to the allegations against the individual Defendants, the Court has primarily relied on it and the evidence in the record to set forth the "Background" section in this Memorandum-Decision and Order.

During Plaintiff A.O.'s fifth grade year, Josh Dann was (and still is) the principal of Petrova Elementary School. *See* Dkt. No. 73 at ¶¶ 11-12. During that year, Plaintiff A.O. alleges that she was subjected to two incidents of harassment or bullying. Plaintiff A.O. alleges that at some point during that year, a fifth grand male student, C.J.C., alleged called her a "Muslim" and asked whether her uncle, Saddam Hussein, was going to blow up the Twin Towers again. *See id.* at ¶ 13. Plaintiff reported this incident to Mr. Dann and her mother, Plaintiff Amy Oliveras. *See id.* at ¶ 15. During her deposition, Plaintiff A.O. first stated that C.J.C. was disciplined as a result of this incident, but then later stated that "[n]othing happened to him" as a result of this comment. *See* Dkt. No. 76-3 at 34-35. Plaintiff A.O. indicated, however, that she does not remember what makes her certain that nothing happened to Plaintiff as a result of this comment. *See id.* at 35-36. Plaintiff A.O. admitted, however, that for the remainder of her fifth grade year, C.J.C. did not bother her again. *See id.* at 37. At some point during the school year, Mr. Dann recalls giving C.J.C. in-school suspension for calling Plaintiff A.O. "blackie." *See* Dkt. No. 73 at ¶ 17.

Around the same time, Plaintiff A.O. alleges that a fifth grade boy, J.K., posted on her MySpace page that she was a "fucked up black girl." *Id.* at ¶ 19. Plaintiff A.O. testified that this exchange took place outside of school and that the exchange had to do with the fact that she and the boy had broken up their relationship. *See id.* at ¶ 20. When Plaintiff Amy Oliveras reported this incident to Mr. Dann, he recommended that she contact the police, which she did. *See id.* at ¶¶ 21-22.[3] Plaintiff Amy Oliveras admits that she was satisfied with the way Mr. Dann handled the situation with J.K. *See id.* at ¶ 25. According to Mr. Dann, the District does not allow students to use social networking sites such as MySpace, Facebook, and Twitter during school hours. *See* Dkt. No. 64-65 at ¶ 24. The District has blocking software that prevents students

---

[3] Mr. Dann has no recollection of Plaintiff Amy Oliveras contacting him and has not record of this conversation. *See* Dkt. No. 64-65 at ¶ 23 (citation omitted).

from accessing these sites while using school computers. *See id.* Plaintiff A.O. claimed no other incidents of harassment or discrimination during that year. *See* Dkt. No. 73 at ¶ 28.

## B.     2009-2010 School Year: 6th Grade

During the 2009-2010 school year, Plaintiff A.O. was in sixth grade. *See* Dkt. No. 73 at ¶ 29. During this school year, Plaintiff A.O. alleged that two students, M.H. and H.S. followed her around and said that they were going to beat her up. *See id.* at ¶ 30; *see also* Dkt. No. 76-3 at 173-74. Plaintiff Amy Oliveras claims to have reported the incident to Plaintiff A.O.'s teacher Ms. Phelan and Plaintiff A.O. had no problems with those girls after this incident. *See id.* at ¶¶ 30, 32. Plaintiffs admit the incident was motivated, at least in part, by the fact that M.H. and H.S. were friends with a girl who liked the same boy as Plaintiff A.O. *See id.* at ¶ 31.

On another occasion in the 6th Grade, Plaintiff A.O. alleged that, after she had dyed her hair red, two students, B.I. and C., kicked her and announced that it was "kick ginger" day. *See id.* at ¶ 33. Plaintiff A.O. did not recall during her deposition whether she reported the incident to any school official. *See id.* at ¶ 34. Neither B.I. nor C. had ever bothered her before or after that day. *See id.* at ¶ 35.

Plaintiff A.O. also alleges that another student, B.S., told her that she did not think "races should mix" and that this same girl posted on her Facebook page that Plaintiff A.O. is a "slut." *See id.* at ¶ 36. Plaintiff A.O. and B.S. have since become friends. *See id.* Plaintiff Amy Oliveras claims that she gave Plaintiff A.O. a copy of the Facebook page to give to Mr. Ellsworth. *See id.* at ¶ 37. Although Plaintiff A.O. does not recall whether she did, in fact, give the copy of the Facebook page to Mr. Ellsworth, Plaintiff Amy Oliveras testified that Plaintiff A.O. told her that she hade given him the Facebook page as instructed. *See id.* at ¶ 37.

Plaintiff A.O. also alleged that a female student K.A. touched her inappropriately on the breast and thigh during a study hall period. *See id.* at ¶ 38. Plaintiff A.O. testified that she reported this incident to Mr. Ellsworth on the same day that it happened. *See id.* Plaintiff A.O. testified that Mr. Ellsworth gave K.A. a warning and told her not to do it again. *See id.* Mr. Ellsworth, however, does not remember Plaintiff A.O. speaking to him about this incident and he has no record of such a conversation. *See id.* at ¶ 39. Although Plaintiff A.O. never had any problems with K.A. before that day and K.A. did not touch her again during that school year, Plaintiff A.O. testified that other incidents involving offensive contact occurred during summer school. *See id.* at ¶ 40.

Defendants claim that, during her sixth grade year, Plaintiff A.O. was identified as one of a group of girls who were experiencing peer conflict. *See id.* at ¶ 41. Defendants allege that these girls were involved in "peer conflict behaviors such as ignoring one another, gossiping about one another, teasing, taunting, etc." Dkt. No. 64-65 at ¶ 41. Although Plaintiffs admit that Defendants blamed Plaintiff A.O. as one of the perpetrators of harassment, they characterize Plaintiff A.O. as a victim. *See* Dkt. No. 73 at ¶ 41. Anastasia Black, a Middle School Guidance Counselor, arranged to meet weekly with these girls to discuss problem solving and anti-bullying behavior. *See id.* at ¶ 42. Plaintiff "A.O. refused to attend the group and her mother sent a letter asking that she be excused. She was the only girl who refused to attend and she never attended a single session." Dkt. No. 64-65 at ¶ 43.[4]

Moreover, Plaintiff A.O. testified that, on one occasion, another student, K.A.,[5] referred to

---

[4] The Court notes that Plaintiffs' response to this allegation reads as follows: "ADMIT that Defendants blamed A.O., a victim, as well as the perpetrators of harassment." Dkt. No. 73 at ¶ 43.

[5] In Plaintiff A.O.'s deposition transcript, the student at issue is referred to as "C.A." *See*

her as a "nigger," while in Ms. Phelan's classroom.  *See* Dkt. No. 76-3 at 181-82.  Plaintiff A.O.

could not recall whether she reported this incident to any member of the school's administration.

*See id.*  Further, during her 50-h hearing, Plaintiff A.O. failed to mention that K.A. had made this

comment.  *See id.* at ¶ 45 n.2 (citation omitted).  Plaintiff Amy Oliveras, denies that K.A. called

Plaintiff A.O. a "nigger" on only one occasion.  *See* Dkt. No. 73 at ¶ 44.  Rather, Plaintiff Amy

Oliveras claims that she reported to Ms. Phelan that Plaintiff A.O. was being called a "nigger" by

K.A. on a daily basis.  *See id.*  Mr. Ellsworth investigated the incident and claimed that he could

not conclusively affirm that K.A. had made the offensive remark.  *See* Dkt. No. 64-65 at ¶ 46.[6]

On June 21, 2010, Plaintiff A.O. left school and headed downtown to hang out with her

friends.  *See* Dkt. No. 73 at ¶ 48.  It was a half-day of school and Plaintiff A.O. left school around

11:00 a.m.  *See id.*  She did not want to take her backpack with her, so she placed her backpack

under an outside staircase on the side of the school.  *See id.*; *see also* Dkt. No. 76-3 at 65-66.

Since the staircase has shrubs around it, Plaintiff A.O. believed "that no one would see it."  Dkt.

---

[5](...continued)
Dkt. No. 76-3 at 181-82.  In the parties' papers in support and opposition to the pending motions, however, the student is referred to as "K.A."  Dkt. No. 64-65 at ¶¶ 44-46; Dkt. No. 73 at ¶¶ 44-46. To avoid confusion, the Court will refer to the student as "K.A."

[6] Plaintiffs deny Defendants' characterization of Plaintiff A.O.'s testimony as claiming that K.A. had only called her a "nigger" on one occasion.  *See* Dkt. No. 73 at ¶¶ 45-46.  Specifically, Plaintiffs claim that Plaintiff A.O. testified that "K.A. had called her a 'nigger' during *social studies class* once."  *Id.* at ¶ 45 (citing Deposition of A.O. August 15, 2012 pp. 181-82).  A review of her deposition, however, reveals that Defendants have accurately portrayed Plaintiff A.O.'s testimony.  During her deposition, Plaintiff A.O. was asked the following question and provided the following response:

Q.      Did it occur once or more than once where she referred to
        you as a nigger?

A.      Once.

Dkt. No. 76-3 at 181-82.

No. 76-3 at 65. The stairs in question led to an exit that was rarely, if ever used, and was usually locked. *See* Dkt. No. 73 at ¶ 49. Plaintiff A.O. did not return for her backpack until 7:30 p.m. *See id.* at ¶ 50. At that time, she found that her school backpack had been vandalized. *See id.* She discovered that someone had removed the contents of the backpack, destroyed most of her belongings, and, using her deodorant, had written the words "fuck nigger" on the concrete that extended from underneath the stairwell. *See id.* Plaintiffs A.O. and Amy Oliveras took photographs of the area using their cell phones, and Plaintiff Hiram Oliveras filed a complaint with the Saranac Police Department that same evening. *See id.* at ¶ 51.

Plaintiffs A.O. and Amy Oliveras went to speak to Mr. Ellsworth about that backpack incident the next day, *i.e.*, Tuesday, June 22, 2010. *See id.* at ¶ 52. Plaintiffs showed Mr. Ellsworth the pictures on Plaintiff A.O.'s phone that they had taken the previous evening. *See id.* Defendants contend that Mr. Ellsworth could not accurately make out the photos on the cell phone and believed that the offensive writing was on the backpack itself. *See* Dkt. No. 64-65 at ¶ 53. Plaintiffs, however, contend that Plaintiff Amy Oliveras was "very clear about where the writing was when speaking to Mr. Ellsworth on Tuesday" and that she even called Mr. Ellsworth on Thursday, June 24, 2010 and told him that the writing was still present and reminded him where it was. *See* Dkt. No. 73 at ¶ 53. Plaintiff Amy Oliveras provided Mr. Ellsworth the names of some students who had allegedly harassed Plaintiff A.O. in the past and Mr. Ellsworth informed Plaintiffs that he would investigate the incident. *See id.* at ¶¶ 54-55. Defendants allege that Mr. Ellsworth spoke to those students, but was unable to determine who had perpetrated the incident. *See* Dkt. No. 64-65 at ¶ 56.[7] On June 25, 2010, the last day of school, Mr. Ellsworth

---

[7] In their response to Defendants' statement of material facts, Plaintiffs "DENY that record cited to supports the statement that Mr. Ellsworth spoke to any of the students which Amy Oliveras identified as students who had harassed, bullied, and used racial slurs against A.O. in the

(continued...)

turned his investigation over to Defendant Kenyon.  *See* Dkt. No. 73 at ¶ 57.  When Plaintiff

Amy Oliveras informed Mr. Ellsworth that she was "not comfortable dealing with Patricia

Kenyon," Mr. Ellsworth told her to speak with Defendant Goldman.  *See id.* at ¶ 58.  Plaintiff

Amy Oliveras left two messages for Defendant Goldman on that same day.  *See id.* at ¶ 59.

Because it was graduation night, Defendant Goldman was not in his office and was also out of

the office on Monday, June 27.  *See id.*  Defendant Goldman returned to his office on Tuesday,

June 28, and received Plaintiff Amy Oliveras' messages at that time.  *See id.*

On Monday morning, Defendant Kenyon was contacted by a community member who

informed her that there was something posted on Facebook regarding writing on a school

building and that it had to do with Plaintiffs.  *See* Dkt. No. 64-39 at 10-12.  Immediately

thereafter, Defendant Kenyon called Plaintiff Amy Oliveras.  *See id.* at 12-13, 17-18.  Defendant

Kenyon asked Plaintiff Amy Oliveras about the situation and she described where the writing

was located and the content of the writing.  *See id.* at 18-19.  Defendant Kenyon contends that

Mr. Ellsworth, in his Friday email, described the writing as being on Plaintiff A.O.'s backpack,

and that she first learned that the writing was on school property until she spoke with Plaintiff

Amy Oliveras.  *See id.* at 20-21.  Further, Plaintiff Amy Oliveras informed Defendant Kenyon

that she had called the police regarding the incident and that they had seen the writing.  *See id.* at

---

[7](...continued)
past.  Mr. Ellsworth informed Plaintiff Amy Oliveras that he had spoken to a bunch of boys on his football team and gotten a list of names from them."  Dkt. No. 73 at ¶ 56 (citing 50-h of Amy Oliveras, May 20, 2011, pp. 29-30).  Defendants cite to Mr. Ellsworth's deposition.  During that deposition, Mr. Ellsworth clearly stated that he conducted an investigation into this incident, that the names provided by Plaintiff Amy Oliveras were a part of that investigation, but that the investigation was ultimately unsuccessful.  *See* Dkt. No. 64-25 at 21-22.  Plaintiff Amy Oliveras does state that Mr. Ellsworth informed her on Wednesday that he spoke with some boys at the school who "were like his ears or something," and that they provided him with several names. *See* Dkt. No. 76-4 at 30-31.  Further, she states that Mr. Ellsworth told her that "he had some names and he gave them to the police."  *See id.*

23.  After talking with Plaintiff Amy Oliveras, Defendant Kenyon went to the custodial staff and asked Bryan McGivney to assist her in finding and removing the writing. *See* Dkt. No. 73 at ¶ 63.  Mr. McGivney walked around the area Defendant Kenyon described but did not see the writing. *See id.* at ¶ 64.  Defendant Kenyon also spoke with Chief Nason of the Saranac Lake Police Department who told her that Plaintiff Amy Oliveras had reported the incident and that Officer Lee Wenske was in charge of the investigation. *See id.* at ¶ 65.  Defendant Kenyon then spoke with Officer Wenske and suggested that he speak with Mr. Ellsworth. *See id.*

On Tuesday, June 29, 2010, Defendant Goldman received Plaintiff Amy Oliveras' messages and called her back. *See id.* at ¶ 66.  Plaintiff Amy Oliveras described to Defendant Goldman where the writing was located and, upon finding it, Defendant Goldman had Mr. McGivney remove it. *See id.* at ¶¶ 66-67.  Although Defendants contend that the writing was "not visible from the sidewalk," Plaintiffs contend that "you could see it through a space in the shrubs." Dkt. No. 64-65 at ¶ 67; *see also* Dkt. No. 73 at ¶ 67.  Defendants assert that there had been no previous incidents of racial graffiti on the school grounds. *See* Dkt. No. 64-65 at ¶ 68. Further, they contend that Plaintiff A.O. is not aware of any other person who saw the backpack or writing. *See id.* at ¶ 69.[8]

Defendant Kenyon wrote Mr. Ellsworth a counseling memorandum for his personnel file for failing to call the police on the same day that he received the complaint from Plaintiff Amy Oliveras and for failing to immediately report the incident to Defendant Kenyon or Defendant Goldman. *See* Dkt. No. 73 at ¶ 70.  Plaintiffs note that the "'counseling memorandum' was dated September 1, 2010, nearly 3 months after the backpack incident and only after media reports of the incident." *Id.*  Although Plaintiffs contend that it has not been produced through discovery,

---

[8] Although Plaintiffs "deny" these two assertions, the only explanation for their denial is that they are "not relevant" and "not material." *See* Dkt. No. 73 at ¶¶ 68-69.

Defendant Kenyon testified that she received a counseling memorandum from Defendant Goldman in September of 2010 for not immediately responding to Plaintiffs' complaint. *See* Dkt. No. 64-39 at 6-8; Dkt. No. 73 at ¶ 71. On September 13, 2010, Defendant Lennon placed a counseling memorandum in Defendant Goldman's file because he did not immediately return Plaintiff Amy Oliveras' telephone calls. *See* Dkt. No. 73 at ¶ 72. The counseling memorandum also notes that Defendant Goldman's inaction cast the District in a "very unfavorable light." *Id.*

On July 4, 2010, Defendants Goldman and Lennon issued a letter of apology in the local newspaper. *See id.* at ¶ 73. "In this letter, they wrote that they should have known that a middle school child was being bullied in the school but they did not." Dkt. No. 64-65 at ¶ 73. "They also wanted to calm the public perception of the incident and to publicly condemn the act." *Id.* "They also wanted to make the public aware that the District would be strengthening its policies against bullying and harassment and because he did not want to appear insensitive to the incident. . . . They asked for community support and assistance in this effort." *Id.*

Although Plaintiff A.O. believes that A.B. was involved in vandalizing her backpack and writing "fuck nigger" on school property, she does not have any personal knowledge of who was involved. *See* Dkt. No. 73 at ¶ 74. Plaintiff claims that a fellow student, M.M., told her that A.B. was involved in the incident. *See id.* After speaking with Plaintiffs A.O. and Amy Oliveras, Defendant Kenyon interviewed A.B. *See id.* As a result of the interview, Defendant Kenyon developed the belief that A.B. was not in the area at the time of the incident and, therefore, not involved. *See id.*; *see also* Dkt. No. 64-39 at 35.


**C.**     **Summer of 2010**

Over the summer, Plaintiff A.O., who had failed science, was required to attend summer school. *See* Dkt. No. 73 at ¶ 76. K.A. was also in the summer school program. *See id.* Summer

school is offered by BOCES and is of limited size. *See id.* at ¶ 77. There was only one summer school science class and, initially, Plaintiff A.O. and K.A. had been assigned as partners in class. *See id.* After learning that K.A. and Plaintiff A.O. had been partnered, Plaintiff Amy Oliveras spoke with school officials and they were separated. *See id.*

Plaintiff A.O. alleged that once or twice when K.A. was walking behind her in the hallway during summer school, K.A. swung her arms in such a way as to touch Plaintiff A.O. on the rear-end. *See id.* at ¶ 78. Plaintiff Amy Oliveras spoke to the BOCES teacher and made arrangements so that she (Amy Oliveras) or a teacher would escort Plaintiff A.O. to and from class. *See id.* Plaintiff A.O. did not report any further problems with K.A. during summer school. *See id.*

Moreover, during the summer, Defendant Kenyon notified Plaintiffs that the District had arranged for Cindy Rockhill, another Middle School Guidance Counselor, to act as Plaintiff A.O.'s liaison for the year and suggested that Plaintiff A.O. bring any problems she might have directly to Ms. Rockhill. *See id.* at ¶ 79.

**D.      2010-2011 School Year: 7th Grade**

Ms. Rockhill initially acted as liaison for Plaintiff A.O. at the beginning of the new school year. *See id.* at ¶ 80. Plaintiff A.O. was also placed in guided study hall with Ms. Leidig, a teaching assistant whom she liked. *See id.* Plaintiff A.O. testified that no student used "any racial slurs or derogatory comments" during her seventh grade year. *See* Dkt. No. 64-12 at 59. Ms. Leidig, however, testified that she overheard D.I. make a racially discriminatory comment toward Plaintiff A.O. *See* Dkt. No. 73 at ¶ 82. Ms. Leidig did not report this conduct, however, and instead spoke with Plaintiff A.O. about it. *See id.* Ms. Leidig testified that Plaintiff A.O. was upset about the comment and claimed that she had never received training from the school

regarding the reporting of racial harassment. *See id.*; Dkt. No. 76-16 at 3-4.

At the beginning of the school year, Ms. Rockhill began meeting with Plaintiff A.O. on a weekly basis. *See* Dkt. No. 73 at ¶ 84. Eventually, Plaintiff A.O. requested that the sessions be limited to only when she felt she needed assistance. *See id.*

In the Fall of 2010, there were a number of complaints involving Plaintiff A.O. as either a victim or culprit. *See id.* at ¶ 85. For example, K.A. alleged that Plaintiff A.O. pushed her in the hallway by the gym. *See id.* at ¶ 86. Specifically, in an email, Ms. Black indicated that she received a report that "girls were getting a drink from the water fountain and [A.O.] shoved the gym door shut on [K.A.] and then [A.O.] said to [K.A.] 'Oh, I am sorry [K.A.], that was meant for [D.]." Dkt. No. 64-26 at 3. In the email, Ms. Black instructed Mr. Ellsworth to check the video camera by the gym door to see if the incident was caught on film. *See id.* Mr. Ellsworth responded that "the camera just shows her roaming a lot when she should be practicing or in the gym." *Id.* Plaintiff A.O. was not disciplined in regards to this complaint. *See* Dkt. No. 73 at ¶ 86. Thereafter, Plaintiff A.O. alleged that K.A. touched her inappropriately during volleyball practice. *See id.* at ¶ 87. Although Plaintiff A.O. alleges that she reported this conduct to Mr. Ellsworth. In response to an email sent by Ms. Black, Mr. Ellsworth indicated that none had reported the incident to him. *See id.*; *see also* Dkt. No. 64-26 at 4. Moreover, Plaintiff A.O. alleged that S.W. sent her inappropriate text messages after volleyball. *See* Dkt. No. 73 at ¶ 88. S.W. was eventually dismissed from the volleyball team, her mother was notified, and a conference was held. *See id.*

Plaintiff A.O. also alleged that K.A. stole her bra. *See id.* at ¶ 90. Eventually, K.A. and Plaintiff A.O. were separated and Ms. Black sent a note home to both K.A.'s and Plaintiff A.O.'s parents advising them that the two girls would be separated. *See id.* It was later determined that K.A. had, in fact, taken Plaintiff A.O.'s bra, which Ms. Black retrieved and returned to Plaintiff

A.O. *See id.* Plaintiff A.O. also alleged that A.B. pushed her as she was going down the stairs, causing her to trip on the last stair. *See id.* at ¶ 91. Mr. Ellsworth investigated the incident and spoke to the students who were in the area. *See id.* at ¶ 92. Plaintiff A.O. did not witness who pushed her and none of the other students admitted to observing who pushed A.O. *See id.* at ¶ 93. Mr. Ellsworth sent Plaintiff Amy Oliveras a letter describing the incident and explaining the steps he had taken to investigate the incident and ensure that school protocol was being followed. *See* Dkt. No. 64-18 at 2.

Plaintiff A.O. also reported that D.H., a male student, stabbed the seats of the school bus. *See* Dkt. No. 73 at ¶ 95. Plaintiff A.O. was sitting with a friend, a Caucasian student, and when they looked over he motioned the knife toward them, making stabbing motions. *See id.* D.H. was disciplined as a result of his conduct. *See id.* at ¶ 96.

Moreover, Plaintiff A.O. alleged that a male student, D.W., threatened to start calling her "titties" during school. *See id.* at ¶ 97. When he investigated the incident by speaking to the students who were present, Defendants allege that Mr. Ellsworth learned that D.W. had not called her that name. *See* Dkt. No. 64-65 at ¶ 98. Defendants claim that D.W. stated that another student, D.I., had called her that name, which Mr. Ellsworth could not confirm. *See id.* Defendants contend that Plaintiff A.O. admitted that D.W. had not called her a name. *See id.* Plaintiffs, however, contend Mrs. Rockhill, "who was present during the interviewing of the students involved, stated that it was 'evident' that D.I. had called A.O. 'titties.'" Dkt. No. 73 at ¶ 98 (citing Deposition of Cindy Rockhill, Jan. 16, 2013, p.18). Plaintiffs contend that Plaintiff A.O. was the only one punished for this incident, for "lying" about D.W., which Defendants claimed could have led to D.W. being unfairly reprimanded. *See id.* at ¶¶ 98-99. Plaintiff A.O. was required to serve work study for two periods and Mr. Ellsworth sent a letter to Plaintiff Amy Oliveras advising her of the incident. *See id.* at ¶¶ 99-100.

Plaintiff A.O. also reported that a student pushed her in the hallway during a fire drill. *See id.* at ¶ 102. Mr. Ellsworth investigated this incident and spoke to the students who were allegedly present. *See id.* He was not able to corroborate that the incident had taken place and he followed up with a letter to A.O.'s parents explaining the alleged incident and his investigation. *See id.* Further, Defendant Kenyon received a report that a student made an inappropriate comment to Plaintiff A.O. on the school bus. *See id.* at ¶ 103. Defendant Kenyon asked Plaintiff A.O. about the incident and she told her that she was not bothered by it. *See id.* Defendant Kenyon followed up with a letter to Plaintiffs Amy and Hiram Oliveras. *See id.*

Other than the time when she alleged that A.B. pushed her in the stairway, Plaintiff A.O. had no other problems with A.B. that year. *See id.* at ¶ 104. Although Defendants contend that none of the incidents during this year were racially related, *see* Dkt. No. 64-65 at ¶ 105, Plaintiffs contend that Plaintiff "A.O. was treated differently and held to different standards than white students." Dkt. No. 73 at ¶ 105.

Plaintiff A.O. was also disciplined a number of times during the school year, which Defendants contend was for her own misbehavior. *See* Dkt. No. 64-65 at ¶ 106; Dkt. No. 73 at ¶ 106. Plaintiff A.O. was disciplined for chewing gum during gym class, which she knew was against the rules. *See id.* She was also disciplined for, among other things, standing on a table in Ms. Leidig's study hall; poking holes in another student's baking project; and refusing to remove an inappropriate necklace, despite being asked to do so many times. *See id.* Plaintiffs admit that Plaintiff A.O. was disciplined, but deny "that the discipline was for her 'own behaviors.'" *See* Dkt. No. 73 at ¶ 106. Rather, Plaintiffs assert that Plaintiff "A.O.'s actions were intensely monitored and scrutinized after Plaintiffs brought legal action. . . . School staff were told by Mrs. Kenyon to 'document more.' . . . Kenyon had been disciplined for her inactions and had been named in Plaintiffs['] Notice of Claim." *Id.* (citations omitted).

On or about October 21, 2010, Plaintiff A.O. received lunch detention from Ms. Leidig. *See id.* at ¶ 107. Plaintiff A.O. did not attend the lunch detention, however, and when Mr. Ellsworth requested that she come to his office, she refused to do that as well. *See id.* at ¶ 108. Defendants contend that Mr. Ellsworth then went directly to Plaintiff A.O.'s Spanish class, removed her from the class and spoke to her in the hallway about her attitude. *See id.* Plaintiffs, however, deny that Mr. Ellsworth "spoke" to her in the hallway. *See id.* Rather, they contend that "Mr. Ellsworth screamed at A.O. that 'out of 300 something kids, [A.O.] is the only one who is disrespectful' and that he 'didn't care what happened to [A.O.] in the past.'" *Id.* (citation omitted). Plaintiffs contend that Plaintiff A.O. did not go to the office because she was scared of Mr. Ellsworth and that "Mr. Ellsworth was so loud, the Spanish teacher needed to close the door because he was disturbing the class." *Id.* (citation omitted). Defendants contend that when A.O. came back into the class, she slammed the door and, Defendant Kenyon, who happened to be in the class performing an evaluation of the teacher, reprimanded her and asked her to apologize. *See* Dkt. No. 64-65 at ¶ 109. Plaintiffs, however, deny that Plaintiff A.O. slammed the door; rather, "it shut quickly making a louder than intended noise." Dkt. No. 73 at ¶ 109. Plaintiffs contend that she immediately apologized to the teacher because it was "startling." *Id.* Despite this, Defendant Kenyon demanded that Plaintiff A.O. apologize again and, when Plaintiff A.O. informed Defendant Kenyon that she already had, Defendant "Kenyon lied to Amy and Hiram Oliveras about A.O.'s response." *Id.*

In October of 2010, for a variety of reasons, including the referrals, Plaintiff A.O.'s alleged problems with other students, and the manner in which the school was handling its investigations, Plaintiff Amy Oliveras requested a meeting with Ms. Rockhill, Defendant Kenyon, Defendant Goldman, Mr. Ellsworth, and Plaintiff A.O.'s teachers. *See* Dkt. No. 73 at ¶ 110. At that meeting, it was determined that Ms. Black would act as Plaintiff A.O.'s liaison from

that point forward. *See id.* at ¶ 111. Further, Plaintiffs Amy and Hiram Oliveras also specifically stated that they wanted Plaintiff A.O. to be held accountable for their behavior and Plaintiff Amy Oliveras felt that it was appropriate for the District to discipline her daughter when she misbehaved in school. *See id.* at ¶¶ 112-13.

Thereafter, Plaintiff A.O. enjoyed talking to Ms. Black and Plaintiff Amy Oliveras was satisfied with the way Ms. Black dealt with her daughter. *See id.* at ¶ 114. Plaintiff Amy Oliveras had previously told Mr. Ellsworth that she did not feel comfortable talking to Defendant Kenyon and had told Ms. Rockhill that Plaintiff A.O. did not feel comfortable talking to Mr. Ellsworth. *See id.* at ¶ 115. Defendants contend that Defendant Goldman and Ms. Rockhill discussed this and agreed to provide Plaintiffs with the option of transferring Plaintiff A.O. to a neighboring school district as one possibility of addressing their concerns with students and faculty at the District. *See id.* at ¶ 116. Plaintiffs, however, deny this allegation and allege that in "early October, 2010, following receipt of Plaintiffs' Notice of Claim, Ms. Rockhill left a voicemail in which she stated that maybe A.O. 'should transfer to another school.'" *Id.* (citing Deposition of Amy Oliveras, Sept. 20, 2012, p.87). Defendants contend that they never expressed a desire that Plaintiff A.O. transfer schools. *See* Dkt. No. 64-65 at ¶ 117. They assert that they "merely offered this as one option to address the Oliveras's concerns." *Id.* (citing Rockhill EBT at 29-30; Goldman EBT at 50-51). According to Defendant Goldman, such transfers were not unusual between Saranac Lake and Neighboring school districts. *See id.* at ¶ 118.[9]

**E.      2011-2012 School Year: 8th Grade**

_____

[9] Plaintiffs deny this allegation as follows: "DENY as not relevant; DENY as not material." Dkt. No. 73 at ¶ 118.

According to Plaintiff A.O.'s deposition testimony, she was subjected to two racially related comments during the 2011-2012 school year. *See* Dkt. No. 64-12 at 133. On one occasion, D.I. called her a "dweeb" and said "at least I'm not black." *Id.* at 125-26. D.I. was suspended for three days as a result of this incident. *See* Dkt. No. 73 at ¶ 124. On another occasion, Plaintiff A.O. alleged that S.W. and J.B., who Plaintiff A.O. clearly identified as her "friends," commented on how white their clothing was, and then said, in front of Plaintiff A.O., "[o]h wait, we can't say that because that's racist." Dkt. No. 64-12 at 125-26. According to Plaintiff Amy Oliveras, the students were required to attend an assembly discussing diversity earlier that day. *See* Dkt. No. 76-5 at 31. The comment that was made regarding the white clothing was intended to "mock[ ] Miss Kenyon[.]" *Id.* The next day, Plaintiff Amy Oliveras met with Mr. Wood, the new dean of students, to discuss the incident and the two students were given one day of in-school suspension. *See id.* During her deposition, Plaintiff was unable to recall any other racially-related comments or incidents during her eighth grade year. *See* Dkt. No. 64-12 at 133.

It was reported that C.J.C. also made a disparaging comment to A.O. about the lawsuit she had filed against the District. *See* Dkt. No. 73 at ¶ 127. C.J.C. was reprimanded for speaking to Plaintiff A.O. about this incident and was disciplined. *See id.* Plaintiff A.O. made no other complaints about racial discrimination during that school year. *See id.* at ¶ 128. Mrs. Leidig testified, however, that she heard either A.B. or J.B. call A.O. a "spic" that year. *See id.* at ¶ 130. Mrs. Leidig believed that she reported the incident to Mr. Wood, but indicated that she "can't be positive." Dkt. No. 76-16 at 5. Mr. Wood testified that Mrs. Leidig did not report the incident to him. *See* Dkt. No. 73 at ¶ 131.

Plaintiffs claim that Plaintiff A.O. was late for school on several occasions "because she could not sleep and because of her nightmares," which were caused by the incidents at school.

*See id.* at ¶ 133.  Also, they claim that she was occasionally dismissed early for doctors appointments and that she was often anxious about having to attend school.  *See id.*  Plaintiff A.O. claims that she began to get nervous about speaking in front of classes after the backpack incident.  *See id.* at ¶ 135.  Defendants note that, at about the same time, Plaintiff A.O. was diagnosed with having Attention Deficit Disorder ("ADD") and received accommodations from the District as a result.  *See* Dkt. No. 64-65 at ¶ 135.  Plaintiff contend, however, that ADD does not cause anxiety about public speaking and deny that the "accommodations were always followed."  Dkt. No. 73 at ¶ 135.

**F.      School Policies**

Defendants contend that, prior to June 2010, the District had an anti-bullying policy in place which prohibited harassment on the basis of race and otherwise.  *See* Dkt. No. 64-65 at ¶ 137.  Plaintiffs, however, deny this contention and argue that the "School District has a custom, policy and practice of ineffectively addressing incidents of racial harassment."  Dkt. No. 73 at ¶ 137 (citing Aff. Of A.O., *generally*; Aff. Of Amy Oliveras, *generally*).  Morever, prior to June 2010, there was a procedure in the middle school that complaints about discriminatory conduct would be investigated by the Dean of Students, with follow-up by the principal, if necessary.  *See* Dkt. No. 73 at ¶ 138.  These policies and procedures were reviewed by the Superintendent at the beginning of ever school year.  *See id.* at ¶ 139.  In addition, Ms. Rockhill taught an anti-bullying curriculum in health class each year that focused on bullying in general.  *See id.* at ¶ 140.  Plaintiff contend that "in the anti-bullying class that A.O. attended Ms. Rockhill used incidents that A.O. had undergone as examples in front of the whole class, which was very upsetting to A.O."  *Id.*  Defendants contend that, when Ms. Rockhill taught this class, Plaintiff "A.O. threw the papers on the floor and told Ms. Rockhill that she did not need them."  Dkt. No. 64-65 at ¶

141.[10]  Moreover, Defendants conducted at least two assemblies in Plaintiff A.O.'s eighth grade year regarding bullying prevention.  *See* Dkt. No. 73 at ¶ 142.  Plaintiffs contend that the second assembly was made optional for Plaintiff A.O.  *See id.*

After June 2010, the District contracted with the Vermont Partnership to establish additional training and procedures specifically with regard to investigating and documenting bullying complaints and implementing anti-bullying measures.  *See id.* at ¶ 143.


## G.    Other Incidents

Defendants contend that, prior to the backpack incident, there were only a few complaints about students engaging in racially discriminatory behavior.  *See* Dkt. No. 64-65 at ¶ 145. Plaintiffs deny this allegation, citing generally to the Affidavit of Rickelmy Williams.  *See* Dkt. No. 73 at ¶ 145.  In her affidavit, Ms. Williams states that she is the mother of K.W., who is one of the few minority students in the District.  *See* Dkt. No. 73-5 at ¶¶ 1-2. Ms. Williams claims that, "[i]n the 2011 – 2012 school year, there was an incident where student whose initials are D.I. made a statement to my daughter and A.O. in the presence of other students, 'At least we're not black.'"  *Id.* at ¶ 3.  Further, Ms. Williams alleges that, soon thereafter, there "was an incident during lunch where a student refused to give my daughter a 'high five' because, as she stated, she '[didn't] want to turn black.'"  *Id.* at ¶ 6.[11]

Moreover, earlier in the 2009-2010 school year, a student, M.B., allegedly made a racially

---

[10] Plaintiffs deny this allegations as follows: "DENY as not material, DENY as not relevant."  Dkt. No. 73 at ¶ 141.

[11] The Court notes that these allegations in no way refute Defendants' statement that, "[p]rior to the backpack incident, there were only a few complaints about students engaging in racially discriminatory behavior."  The backpack incident occurred in June of 2010 and the incidents discussed by Ms. Williams occurred during the 2011-2012 school year.

derogatory comment to Ms. Donnelly, an African-American teacher in the middle school. *See* Dkt. No. 73 at ¶ 146. Mr. Ellsworth investigated the incident. *See id.* Ms. Donnelly did not want to pursue the matter and did not want Mr. Ellsworth to call the police. *See id.* Mr. Ellsworth acceded to Ms. Donnelly's request and verbally reprimanded the student. *See id.* at ¶ 147.

Before Plaintiff A.O.'s time at the middle school, the grandmother of a black student, T.J., alleged that a teacher had called her grandson a "nigger" and made derogatory comments to him. *See id.* at ¶ 149. Defendant Kenyon investigated the incident and found that the allegations were not supported. *See id.* T.J. would occasionally complain to Mr. Ellsworth that other students were calling him names. *See id.* at ¶ 150. On these occasions, Mr. Ellsworth investigated the claims, but was unable to corroborate the students claims. *See id.*

After the backpack incident, Mr. Wood received several complaints about students making racially discriminatory comments. *See id.* at ¶ 151. In addition to Plaintiff A.O.'s complaint about J.B. and S.W., Mr. Wood received a complaint that B.I. had called another student a "nigger." *Id.* Mr. Wood investigated the incident, but could not corroborate that it had happened. *See id.* at ¶ 152. He called B.I.'s parents and spoke to them about the incident. *See id.* He also spoke directly with B.I. *See id.* There was also an incident where a student, B.S., told an African American student that another student, Ar.B., would not touch her because she was afraid that she would become black. *See id.* The teacher who heard these comments counseled these students about their inappropriate comments and the matter was resolved. *See id.*; *see also* Dkt. No. 64-57 at ¶ 14. Defendants contend that C.J.C. also made inappropriate racial comments about students both in the 2011-2012 school year and during the 2010-2011 school year. *See id.* C.J.C. was removed from the classroom because of his conduct and required to attend "alternative education." *Id.*; *see also* Dkt. No. 64-62 at 4. Further, C.J.C. later had a letter placed in his file, a

letter was sent home to his parents, he was required to take final exams in a separate location, and was required to leave the building by 10:50 each day. *See* Dkt. No. 64-62 at 7.

At her deposition, Defendant Kenyon could recall only three (3) times that someone used the word "nigger" or another racially derogatory name while she was principal, and two of them had to do with A.O. *See* Dkt. No. 73 at ¶ 154. Defendant Kenyon has been principal for thirteen (13) years. *See id.*

Plaintiffs served their Notice of Claim on or about September 16, 2010. *See id.* at ¶ 156. After they served their Notice of Claim, Plaintiff Amy Oliveras continued to meet with the District officials and complained to Ms. Rockhill, Defendant Kenyon, Mr. Ellsworth, and Ms. Black about student's behavior towards Plaintiff A.O. and Plaintiff A.O.'s treatment by the District. *See id.* at ¶ 157. Plaintiff A.O. also continued to complain to District officials about her treatment by other students and by teachers and administrators in the District after the Notice of Claim was served. *See id.* at ¶ 158. Plaintiff Hiram Oliveras met with Defendant Kenyon to discuss Plaintiff A.O.'s educational progress and her disciplinary actions after Plaintiffs' Notice of Claim was served. *See id.* at ¶ 159.

## III. DISCUSSION

### A.    Summary judgment standard

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Id.* at 36-37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a

motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513-14, 91 L. Ed. 2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

## B.     Discovery

In opposition to Defendants' motion for summary judgment, Plaintiffs contend that Defendants failed to produce evidence during discovery. Plaintiffs ask the Court that the same be held against Defendants and a negative inference be drawn in deciding the motions for summary judgment. *See* Dkt. No. 76 at ¶¶ 5-9.

As Defendants correctly point out, the Court previously addressed this issue. Specifically, in a text order dated June 13, 2013, the Court held as follows:

> In a69letter dated June 10, 2013, Plaintiffs request that the Court grant a thirty (30) day extension to the response deadline for the pending motions for summary judgment. Plaintiffs also state that they "need to conduct further depositions of witnesses due to Defendants late disclosures," and request that the Court order that these depositions be conducted "at the expense of Defendants due to their bad faith." Having reviewed the submissions, the Court

hereby GRANTS in part and DENIES in part Plaintiffs' letter motion. Plaintiffs' motion is granted insofar as Plaintiffs seek an extension of time to respond to Defendants' motions for summary judgment. Plaintiffs' response shall be submitted no later than thirty (30) days from the filing date of this text order. Absent extraordinary circumstances, no additional extensions will be granted. To the extent that Plaintiffs seek additional discovery, however, the motion is denied. Magistrate Judge Hummel previously extended the discovery deadline to March 31, 2013, after having granted previous extensions, and indicated in the most recent order that there "will be no further extensions of the discovery deadline absent extraordinary circumstances." *See* Dkt. No. 29. Moreover, May 1, 2013, Magistrate Judge Hummel granted Plaintiffs' letter request for an order compelling additional response to their discovery demands. *See* Dkt. No. 59. In the present motion, Plaintiffs have failed to demonstrate bad faith on Defendants' part or that extraordinary circumstances exist that would compel the Court to reopen discovery. Finally, Plaintiffs ask the Court to compel Defendants to produce evidence and material that Plaintiffs requested from Defendants between January 11, 2013 and March 22, 2013. It is unclear why Plaintiffs have only now sought the Court's intervention regarding these alleged outstanding discovery requests, but they have clearly failed to diligently pursue Defendants' compliance in their requests. *See Jackson v. Bailey*, 305 Fed. Appx. 246, 248 (5th Cir. 2008) (citation omitted). Further, Magistrate Judge Hummel held a discovery conference with the parties on April 25, 2013 and Plaintiffs failed to address these issues at that time. Having failed to act with diligence or demonstrate how this requested discovery pertains to the pending motions, the Court finds that Plaintiffs are not entitled to this relief. IT IS SO ORDERED.

Dkt. No. 71.

In light of the Court's previous ruling on this matter, the Court denies Plaintiffs' request that it draw "a negative inference" against Defendants in deciding their motions for summary judgment.

## C.     Title VI

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to

discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Although Title VI does not provide for individual liability, *see Hickey v. Myers*, 852 F. Supp. 2d 257, 267 (N.D.N.Y. 2012), "[i]n certain circumstances, courts view actions of a third party as intentional violations by the funding recipient itself." *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 664-65 (2d Cir. 2012) (citations omitted). "For example, in the educational setting, a school district is liable for intentional discrimination when it has been 'deliberately indifferent' to teacher or peer harassment of a student." *Id.* at 665 (citations omitted).

The deliberate indifference standard outlined by the Supreme Court in *Davis v. Monroe County Board of Education* is a narrow one. *See Davis v. Monroe County Board of Education*, 526 U.S. 629, 644-45 (1999). "Liability only arises if a plaintiff establishes: (1) substantial control, (2) severe and discriminatory harassment, (3) actual knowledge, and (4) deliberate indifference." *Zeno*, 702 F.3d at 665 (citations omitted).

"A school district will be subject to liability for third-party conduct only if it 'exercises substantial control over both the harasser and the context in which the known harassment occurs.'" *Id.* (quoting *Davis*, 526 U.S. at 644-45, 119 S. Ct. 1661). "A school district, the Supreme Court noted, exercises substantial control over the circumstances of the harassment when it occurs 'during school hours and on school grounds.'" *Id.* (quoting *Davis*, 526 U.S. at 646, 119 S. Ct. 1661). "Similarly, a school district's authority to take remedial action lies in its longstanding disciplinary oversight over its students." *Id.* (citations omitted).

"Even assuming the requisite level of control, not all harassment is actionable. The harassment must be 'severe, pervasive, and objectively offensive' and discriminatory in effect." *Id.* (quoting *Davis*, 526 U.S. at 650–51, 119 S. Ct. 1661). "Discrimination under Title VI is not limited to being excluded from, or denied the benefits of, a particular school program." *Id.* at 665-66 (citing 42 U.S.C. § 2000d; 34 C.F.R. § 100.3(a)). "Discriminatory actions '[r]estrict an

individual in any way in the enjoyment of any advantage or privilege enjoyed by others receiving any service, financial aid, or other benefit' under the school system." *Id.* (quotation and other citations omitted). "Educational benefits include an academic environment free from racial hostility." *Zeno*, 702 F.3d at 666 (citation omitted); *see also Hayut*, 352 F.3d at 750 ("We also find that . . . [misconduct that] simply created a disparately hostile educational environment relative to her peers . . . could be construed as depriving [the victim] of the benefits and educational opportunities available at [the school]").

In addition, a school district must know of the harassment. Constructive knowledge is not enough; only actual knowledge is a predicate to liability. *Zeno*, 702 F.3d at 666 (citing *Davis*, 526 U.S. at 641–43, 119 S. Ct. 1661; *Gebser*, 524 U.S. at 288, 118 S. Ct. 1989).

"Finally, 'only deliberate indifference to [student-on-student] harassment can be viewed as discrimination by school officials themselves.'" *Id.* (quoting *Gant*, 195 F.3d at 140) (other citation omitted). "The school's action — or inaction — must, 'at a minimum, cause students to undergo harassment or make them liable to or vulnerable to it.'" *Id.* (quoting *Davis*, 526 U.S. at 645, 119 S. Ct. 1661).

"A finding of deliberate indifference depends on the adequacy of a school district's response to the harassment." *Zeno*, 702 F.3d at 666 (citing *Hayut*, 352 F.3d at 750). "A failure to respond, . . . a response that 'only follows after a lengthy and unjustified delay,' . . . and a response that 'amount[s] to deliberate indifference to discrimination,' have all been found inadequate." *Id.* (internal quotations and citations omitted). "Nevertheless, a school district's actions are only deliberately indifferent if they were 'clearly unreasonable in light of the known circumstances.'" *Id.* (citing *Davis*, 526 U.S. at 648, 119 S. Ct. 1661; *Gant*, 195 F.3d at 141). "Thus, when weighing the adequacy of a response, a court must accord sufficient deference to the decisions of school disciplinarians." *Id.* (citations omitted); *see also Davis*, 526 U.S. at 648

("[C]ourts should refrain from second-guessing the disciplinary decisions made by school administrators" (citation omitted)).  "To that end, victims do not have a right to specific remedial measures."  *Id.* (citing *Davis*, 526 U.S. at 648, 119 S. Ct. 1661).

### *1. The individual Defendants*

Defendants contend that these claims must be dismissed to the extent that they are asserted against the individual Defendants because Title VI does not provide for individual liability.  *See* Dkt. No. 60-1 at 9.  Plaintiffs do not oppose this argument.

As such, the Court grants Defendants' motions for summary judgment as to Plaintiffs' Title VI claims against the individual Defendants.  *See Hickey*, 852 F. Supp. 2d at 267.

### *2. Defendant Saranac Lake Central School District*

Defendant Saranac Lake C.S.D. contends that Plaintiffs' Title VI claim must be dismissed because the evidence shows that Plaintiff A.O. was not subject to a hostile education environment and that the District and its employees were not deliberately indifferent to Plaintiffs' complaints of racial harassment by other students.  *See* Dkt. No. 64-66 at 19-26.  Specifically, Defendant Saranac Lake C.S.D. argue that Plaintiffs' complaints of harassment were not severe or pervasive, that they reasonably responded to the complaints, and that Plaintiff A.O. did not suffer from a deprivation of educational opportunities as a result of the complaints.  *See id.*

In the present matter, the Court finds that Plaintiff A.O.'s complaints of harassment do not rise to the level of "severe and pervasive racial hostility" required to establish a Title VI violation.  Plaintiff A.O. complained of approximately six incidents of known alleged racial hostility occurring over a period of four years.  Plaintiff A.O. alleged two incidents in the 2008-2009 school year, only one of which, the comment by C.J.C., occurred during school.  *See* Dkt.

No. 64-65 at ¶¶ 13, 19.  Upon reporting to Mr. Dann that C.J.C. had called Plaintiff A.O. a

"Muslim" and "blackie," C.J.C. received in-school suspension.  *See id.* at ¶ 17; Dkt. No. 73 at ¶

17.  C.J.C. did not call Plaintiff A.O. any other names that year.  *See id.* at ¶ 18.  The other

incident that year involved a fifth grade boy, J.K., posting on Plaintiff A.O.'s MySpace page that

she was a "fucked up black girl" and recommended that she commit suicide.  *Id.* at ¶ 19.

Plaintiffs admit that this exchange took place outside of school and that the exchange had to do

with the fact that Plaintiff A.O. and the boy had broken up their relationship.  *See* Dkt. No. 73 at

¶ 20.  When they reported the incident to Mr. Dann, he recommended that they should contact the

police, which they did.  *See id.* at ¶¶ 21-22.

In the 2009-2010 school year, Plaintiff A.O. alleged that K.A. had called her "nigger" one

time during social studies class.  *See id.* at ¶ 44.  Plaintiff Amy Oliveras claims that she reported

to Ms. Phelan that Plaintiff A.O. was being called a "nigger" by K.A. on a daily basis.  *See id.*

Plaintiff Amy Oliveras, however, was never present when K.A. allegedly made any racially

derogatory comments to Plaintiff A.O. and did not hear K.A. make any such comments.  Mr.

Ellsworth investigated the incident and claimed that he could not conclusively affirm that K.A.

had made the offensive remark.  *See* Dkt. No. 64-65 at ¶ 46.  The "backpack" incident, which will

be discussed more fully below, also occurred at the end of the 2009-2010 school year.  The

evidence fails to demonstrate that any other complained of incidents were motivated by Plaintiff

A.O.'s race.  Regarding the 2010-2011 school year, although Plaintiff A.O. made several

complaints to school officials about incidents involving other students, only one of those

incidents had anything to do with Plaintiff A.O.'s race.  Specifically,  Ms. Leidig testified that she

overheard D.I. make a racially discriminatory comment toward Plaintiff A.O.  *See* Dkt. No. 73 at

¶ 82.

During the 2011-2012 school year, Plaintiff A.O. alleged that she was subjected to two

race-related inappropriate comments. *See* Dkt. No. 64-12 at 133. On one occasion, D.I. called her a "dweeb" and said "at least I'm not black." *Id.* at 125-26. D.I. was suspended for three days as a result of this incident. *See* Dkt. No. 73 at ¶ 124. On another occasion, Plaintiff A.O. alleged that S.W. and J.B., who Plaintiff A.O. clearly identified as her "friends," commented on how white their clothing was, and then said, in front of Plaintiff A.O., "[o]h wait, we can't say that because that's racist." Dkt. No. 64-12 at 125-26. According to Plaintiff Amy Oliveras, the students were required to attend an assembly discussing diversity earlier that day. *See* Dkt. No. 76-5 at 31. The comment that was made regarding the white clothing was intended to "mock[ ] Miss Kenyon[.]" *Id.* The next day, Plaintiff Amy Oliveras met with Mr. Wood, the new dean of students, to discuss the incident and the two students were given one day of in-school suspension. *See id.* During her deposition, Plaintiff A.O. was unable to recall any other racially-related comments or incidents during her eighth grade year. *See* Dkt. No. 64-12 at 133. Mrs. Leidig testified, however, that she heard either A.B. or J.B. call A.O. a "spic" that year. *See* Dkt. No. 73 at ¶ 130. Mrs. Leidig believed that she reported the incident to Mr. Wood, but indicated that she "can't be positive." Dkt. No. 76-16 at 5. Mr. Wood testified that Mrs. Leidig did not report the incident to him. *See* Dkt. No. 73 at ¶ 131.

While the vandalism of Plaintiff A.O.'s backpack and the writing on the concrete next to it were reprehensible, the incident did not occur because of Defendants' deliberate indifference. In order for a funding recipient to be held liable under a theory of "deliberate indifference," the funding recipient must have substantial control over both the alleged harasser and the environment in which the harassment occurs. *Tyrell v. Seaford Union Free Sch. Dist.*, 792 F. Supp. 2d 601, 626 (E.D.N.Y. 2011) (citation omitted). Although the incident occurred on school property, both Plaintiffs and Defendants were unable to identify the perpetrator(s) of the "backpack incident." In *Doe v. Blackburn College*, the court held, "[g]iven that *Davis* instructs

that a school cannot be deliberately indifferent if it lacks authority to take remedial action, this

Court cannot find that Blackburn had control over the harasser when the identity, and whether he

is even a student, is unknown." *Doe v. Blackburn College*, No. 06-3205, 2012 WL 640046, *12

(C.D. Ill. Feb. 27, 2012). Similarly, the incidents that occurred outside of school cannot cause

Title VI liability because Defendants did not have substantial control over either the harasser or

the environment in which the harassment occurred.

Moreover, Plaintiffs have failed to show that Defendants' response to the alleged

harassment was "clearly unreasonable in light of known circumstances." *D.T. v. Somers Cent.*

*Sch. Dist.*, 348 Fed. Appx. 697, 700 (2d Cir. 2009). This indifference must, "at a minimum,

cause students to undergo harassment or make them liable or vulnerable to it." *Id.* (citations

omitted).

The District properly responded to the claims of discrimination that were brought to their

attention before the "backpack incident." Mr. Dann reprimanded and disciplined C.J.C. about his

racial comment toward Plaintiff A.O., *see* Dkt. No. 73 at ¶ 17; and C.J.C. did not engage in

similar conduct towards Plaintiff A.O. during that school year. *See id.* at ¶ 18. Although Mr.

Dann could not recall Plaintiff Amy Oliveras advising him of the incident between J.K. and

Plaintiff A.O., Plaintiff Amy Oliveras herself agreed that his response was reasonable, especially

in light of the fact that the comments were made in the context of a broken relationship and

outside of school. *See id.* at ¶¶ 19-25. Moreover, Mr. Ellsworth promptly investigated Plaintiff

A.O.'s allegation that K.A. used the "n" word, but he could not confirm whether it actually

happened. *See id.* at ¶¶ 44-46. Also, as noted, while Plaintiff Amy Oliveras claims that K.A.

repeatedly called Plaintiff A.O. the "n" word, Plaintiff A.O. testified that it happened only that

one time. *Compare* Dkt. No. 64-65 at ¶ 44 (citing A.O. EBT, 8/15/12, at 181, 182); *with* Dkt.

No. 73 at ¶ 44 (citing Deposition of Amy Oliveras, pp. 19-20; Aff. of Amy Oliveras, ¶¶ 8-10).

Regarding the "backpack incident," the District's response was not "clearly unreasonable." Mr. Ellsworth testified that he misunderstood where the offensive writing was located, believing it to be on the backpack itself. *See* Dkt. No. 64-65 at ¶ 53 (citing Ellsworth EBT 1/11/13, Ex. 24 to Haynes Aff., at 37; Ellsworth Aff. at ¶ 4). Regardless of this, the fact that Mr. Ellsworth did not immediately have the writing removed or contact the police is not evidence of deliberate indifference when considering the facts of the case. The incident occurred at the end of the school year when students were leaving for the summer and the District was preparing for graduation. Mr. Ellsworth, immediately conducted an investigation into who may have been involved in the incident. *See id.* at ¶¶ 55-56. Mr. Ellsworth spoke with the students who Plaintiff Amy Oliveras indicated might be involved. Also, Plaintiff Amy Oliveras testified that Mr. Ellsworth informed her on Wednesday that he spoke with some boys at the school who "were like his ears or something," and that they provided him with several names. *See* Dkt. No. 76-4 at 30-31. Further, she stated that Mr. Ellsworth told her that "he had some names and he gave them to the police." *See id.* When Mr. Ellsworth was unable to make a determination as to the culprit(s), he turned the investigation over to Defendant Kenyon. *See* Dkt. No. 64-65 at ¶ 57.

Although ultimately unsuccessful, Defendant Kenyon sent a member of the custodial staff, Brian McGivney, to locate and remove the writing. *See* Dkt. No. 73 at ¶¶ 63-64. Moreover, Defendant Kenyon also spoke with Chief Nason of the Saranac Lake Police Department who told her that Plaintiff Amy Oliveras had reported the incident and that Officer Lee Wenske was in charge of the investigation. *See id.* at ¶ 65. Defendant Kenyon then spoke with Officer Wenske and suggested that he speak with Mr. Ellsworth. *See id.* Thereafter, on July 4, 2010, Defendants Goldman and Lennon issued a letter of apology in the local newspaper. *See id.* at ¶ 73. In this letter, they wrote that they should have known that a middle school child was being bullied in the school but they did not. *See id.* They also wanted the public to be aware that

the District would be strengthening its policies against bullying and harassment. *See id.* Plaintiff Amy Oliveras left Defendant Goldman two messages on Friday, June 25, 2010. *See id.* at ¶ 59. Defendant Goldman was out of the office that day because of graduation. *See id.* Defendant Goldman was also out of the office on Monday, June 28, 2010. *See id.* When he returned to the office on Tuesday, June 29, 2010, he immediately called her back and, upon learning where the writing was, Defendant Goldman had Mr. McGivney remove the writing. *See id.* at ¶ 66.

Moreover, Plaintiffs do not deny that the writing was in a remote and secluded location. Plaintiffs do not identify anyone who actually saw the graffiti.

After this incident, the District strengthened its investigation of all bullying incidents and engaged the Vermont Partnership to assist in the training of staff on the new policies. The District also provided Plaintiff A.O. with Cindy Rockhill as a liaison to assist her in her return to school and then transferred those duties to Ms. Black when Plaintiffs Amy and Hiram Oliveras objected to Ms. Rockhill. Thereafter, each time Plaintiff A.O. complained of a racial incident with another student, the District officials investigated the incident, disciplined the student(s) responsible, and alerted Plaintiffs Amy and Hiram Oliveras of the investigation. *See id.* at ¶¶ 120-21. The fact, on occasion, that Plaintiffs may not have agreed with the District's response is inapposite. The District was not required to proceed in any particular manner, even if there was a policy in place calling for a different investigation or punishment. "[S]chool districts are not constrained in their ability to fashion appropriate relief, but rather retain broad flexibility in devising a response." *KF ex rel. CF v. Monroe Woodbury Cent. Sch. Dist.*, No. 12 Civ. 2200, 2013 WL 177911, *7 (S.D.N.Y. Jan. 16, 2013) (citing *Davis*, 526 U.S. at 648); *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 173–74 (1st Cir. 2007) (finding that a prompt response to harassment, immediate investigation, proposed remedial measures, and cooperation with police — who recommended no further action — were not deliberately indifferent responses), *rev'd on*

*other grounds by*, 555 U.S. 246, 129 S. Ct. 788, 172 L. Ed. 2d 582 (2009); *Porto v. Town of Tewksbury*, 488 F.3d 67, 74 (1st Cir. 2007) (holding that separating the harasser and victim, and involving the guidance counselor, were not deliberately indifferent responses to peer sexual harassment, even if ultimately ineffective).

Based on the foregoing, the Court finds that Plaintiffs have failed to put forth sufficient evidence to create a material issue of fact as to their Title VI claim; and, therefore, the Court grants Defendants' motion for summary judgment as to this claim.

### D.  42 U.S.C. § 1983

Section 1983 imposes liability for "conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution and laws." *Rizzo v. Goode*, 423 U.S. 362, 370-71 (1976) (quoting 42 U.S.C. § 1983).  Not only must the conduct deprive the plaintiff of rights and privileges secured by the Constitution, but the actions or omissions attributable to each defendant must be the proximate cause of the injuries and consequent damages that the plaintiff sustained.  *See Brown v. Coughlin*, 758 F. Supp. 876, 881 (S.D.N.Y. 1991) (citing *Martinez v. California*, 444 U.S. 277, 100 S. Ct. 553, 62 L. Ed. 2d 481, *reh. denied*, 445 U.S. 920, 100 S. Ct. 1285, 63 L. Ed. 2d 606 (1980)).  As such, for a plaintiff to recover in a section 1983 action, he must establish a causal connection between the acts or omissions of each defendant and any injury or damages he suffered as a result of those acts or omissions.  *See id.* (citing *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S. Ct. 693, 58 L. Ed. 2d 619 (1979)) (other citation omitted).

### 1. Plaintiffs' Equal Protection Claim

A section 1983 equal protection claim asserting racial harassment of a student by another

student requires proof

> (1) that the child in question was in fact harassed by other students based on his race; (2) that such race-based harassment was "actually known" to the defendant school official; and (3) that the defendant's response to such harassment was so "clearly unreasonable in light of the known circumstances" as to give rise to a reasonable inference that the defendant himself intended for the harassment to occur.

*DiStiso*, 691 F.3d at 241 (citations omitted). As with a Title VI claim, in order for a plaintiff to succeed on a equal protection claim, he is "required to prove intentional racial discrimination." *Preusser ex rel. E.P. v. Taconic Hills Cent. Sch. Dist.*, ___ Fed. Appx. ___, 2013 WL 6818384, *1 (2d Cir. 2013) (citations omitted); *see also DiStiso*, 691 F.3d at 240 ("To prevail on a § 1983 claim of race discrimination in violation of equal protection, the law requires a plaintiff to prove the defendant's underlying racially discriminatory intent or purpose") (internal quotation marks omitted).

For the reasons set forth above, the Court finds that Plaintiffs have failed to meet their burden. The undisputed evidence demonstrates that in all incidents Defendants' responses to the allegations of harassment were reasonable. The evidence establishes that the claimed incidents were isolated and, when brought to Defendants' attention, the individuals involved engaged in no further harassment of Plaintiff A.O. Further, as discussed, Plaintiffs have failed to set forth any facts establishing that Defendants' actions or inactions were the result of an underlying racially discriminatory intent or purpose. To the extent that Plaintiffs contend that the involved individuals should have been more severely disciplined, the assertion must be rejected. Courts must give substantial deference to the decisions of school administrators and should "refrain from second-guessing the disciplinary decisions made by school administrators." *Davis*, 526 U.S. at 648; *see also Barnett ex rel. M.B. v. Johnson City Sch. Dist.*, No. 3:04-CV-763, 2006 WL 3423872, *5 (N.D.N.Y. Nov. 28, 2006) (citations omitted).

Based on the foregoing, the Court grants Defendants' motions for summary judgment as to Plaintiffs' equal protection claims.

### 2. Plaintiffs' First Amendment Retaliation Claim

Defendants contend that the Court must dismiss Plaintiffs' First Amendment retaliation claim because there is no evidence that Plaintiffs' speech was chilled. *See* Dkt. No. 60-1 at 9-10; Dkt. No. 64-66 at 30; Dkt. No. 62-2 at 17-19. Further, Defendants argue that none of the District officials or employees retaliated against Plaintiff A.O. or her parents after they served the notice of claim. *See* Dkt. No. 60-1 at 10; Dkt. No. 64-66 at 30. Rather, Defendants contend that they went out of their way to protect Plaintiff A.O. after Plaintiffs filed their notice of claim. *See id.* "They investigated each and every complaint she made and, where they confirmed the allegations, they disciplined the students." *Id.* Moreover, Defendants assert that they did not single Plaintiff A.O. out for discipline and the record demonstrates that the discipline was appropriate. *See* Dkt. No. 64-66 at 30-31 (citing SOMF ¶¶ 106, 107, 108). Finally, Defendants Kenyon and Goldman argue that they are entitled to summary judgment on these claims because Plaintiffs failed to establish their personal involvement in the alleged retaliatory conduct. *See* Dkt. No. 60-1 at 10-11; Dkt. No. 62-2 at 18-19.

Plaintiffs, however, contend that there "were 12 'student referral[s]' between September 24, 2010 and October 29, 2010. Plaintiffs' Notice of Claim was served mid-September 2010." Dkt. No. 75 at 23. Plaintiffs assert that "incidents of discipline were a sham and the evidence clearly shows that they were a pretext for retaliation." *Id.* Moreover, Plaintiffs contend that they have created material issues of fact as to whether Defendants' "conduct was sufficient to chill the exercise of A.O.'s First Amendment Rights[.]" *See id.* at 25-26. Nevertheless, Plaintiffs argue that, despite Defendants' contentions to the contrary, Second Circuit precedent does require a

chilling effect in all First Amendment retaliation cases. *See id.* at 26 (citing *Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004)).

"[T]he Second Circuit has 'described the elements of a First Amendment retaliation claim in several ways, depending on the factual context.'" *Sloup v. Loeffler*, No. 05-CV-1766, 2008 WL 3978208, *22 (E.D.N.Y. Aug. 21, 2008) (quoting *Williams v. Town of Greenburgh*, [535 F.3d 71, 76 (2d Cir. 2008)]). Where a private citizen asserts a First Amendment claim against a public official, the plaintiff must demonstrate that (1) the plaintiff engaged in speech or conduct that the First Amendment protects; (2) the plaintiff's exercise of his First Amendment rights motivated the defendant's actions; and (3) the defendant's actions effectively chilled the plaintiff's exercise of those rights. *See Williams v. Town of Greenburgh*, 535 F.3d 71, 76 (2d Cir. 2008) (citing *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001)); *Moran v. City of New Rochelle*, 346 F. Supp. 2d 507, 517 (S.D.N.Y. 2004) (citation omitted).

In cases "involving criticism of public officials by private citizens," the Second Circuit has generally "impose[d] an actual chill requirement for First Amendment retaliation claims[,]" *i.e.*, a requirement that the plaintiff allege and ultimately prove an "actual chill" of his First Amendment rights. *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (citing *Spear v. Town of West Hartford*, 954 F.2d 63, 68 (2d Cir. 1992)); *see also Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001) (holding that the "plaintiff must show, with respect to the third element, that his First Amendment rights were 'actually chilled'"). To establish this element, it is not enough for the plaintiff simply to show that he changed his behavior in some way; he must show that the defendant intended to, and did, prevent or deter him from exercising his rights under the First Amendment. *See, e.g., Greenwich Citizens Comm., Inc. v. Counties of Warren & Washington Indus. Dev. Agency*, 77 F.3d 26, 31 (2d Cir. 1996) (holding that, to establish a First Amendment retaliation claim, the plaintiffs must show that the defendants acted "with the purpose of deterring

the exercise of First Amendment freedoms"); *Wolff v. Town of Mount Pleasant*, No. 06 Civ. 3864, 2009 WL 1468691, *6 (S.D.N.Y. Apr. 27, 2009) (holding that, "[i]n order to maintain a First Amendment retaliation claim, a private citizen complainant must allege that the defendant took some action in response to his or her First Amendment activity that 'effectively chilled the exercise of his First Amendment right'" (quoting *Williams*, 535 F.3d at 76)); *Spear v. Town of W. Hartford*, 954 F.2d 63, 67 (2d Cir. 1992) (holding that "Spear's naked assertion of a chill does not suffice to defeat a Rule 12(b)(6) motion"); *see also Colombo v. O'Connell*, 310 F.3d 115, 117 (2d Cir. 2002) (affirming summary judgment for the defendant on the plaintiff's First Amendment claim and indicating that the plaintiff had failed to even state a valid claim because she had "alleged no actual affect on the exercise of her First Amendment rights at all").

However, "where the retaliation is alleged to have caused an injury separate from any chilling effect, such as a job loss or demotion, an allegation as to a chilling effect is not necessary to state a claim." *Puckett v. City of Glen Cove*, 631 F. Supp. 2d 226, 239 (E.D.N.Y. 2009) (citing *Morrison v. Johnson*, 429 F.3d 48, 51 (2d Cir. 2005)) (other citation omitted). As the Second Circuit has noted,

> defendants are correct that a plaintiff asserting First Amendment retaliation must allege some sort of harm, but they are wrong that this harm must, in all cases, be a chilling of speech. In the employment context, under this framework, the harm is some concrete diminution in job responsibilities, security, or pay – up to and including termination. In the prison context, the harm could include such an adverse action as placing a plaintiff in keeplock for a period of weeks. Indeed, even in certain cases involving public official/private citizen retaliation claims, we have seemingly not imposed a subjective chill requirement where some other harm is asserted. For example, in *Gagliardi v. Village of Pawling*, 18 F.3d 188 (2d Cir. 1994), we confronted the plaintiffs' claim that the municipal defendants' alleged misapplication of the zoning code was conducted in retaliation for the plaintiffs' exercise of their free speech rights. To establish a retaliation claim under 42 U.S.C. § 1983 under those circumstances, we held that the plaintiffs must initially show (1) "that [their] conduct was protected by the first

amendment," and (2) that "defendants' conduct was motivated by or substantially caused by [plaintiffs'] exercise of free speech." *Id.* at 194 (quoting *Brady v. Town of Colchester*, 863 F.2d 205, 217 (2d Cir. 1988)), and nothing beyond the two requirements. Still, the *Gagliardi* plaintiffs' retaliation claim apparently survived a motion to dismiss because (1) they made an adequate showing on both of these accounts, but also because (2) they adequately pleaded non-speech injuries – among other things, noise pollution. *Id.* at 190. *See also Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83 (2d Cir. 2002) (applying same test in similar context).

*Gill*, 389 F.3d at 383.

In the present matter, Plaintiffs have failed to put forth sufficient evidence to support their claim that Defendants or any of their employees engaged in retaliation because Plaintiffs exercised their First Amendment rights. First, the Court finds that, contrary to Plaintiffs' assertions, Plaintiffs' have failed to put forth any evidence to support their claim that Defendants' conduct actually chilled their speech. Plaintiffs cite to several incidents and claim that "[t]his behavior would chill a reasonable 14 year old child's exercise of their First Amendment rights." Dkt. No. 75 at 25-26. Plaintiffs must establish that the conduct **actually** chilled the exercise of her rights, not that the conduct would have made a reasonable child forego the exercise of his or her rights. *See Wolff v. Town of Mount Pleasant*, No. 06 Civ. 3864, 2009 WL 1468691, *6 (S.D.N.Y. Apr. 27, 2009) (holding that, "[i]n order to maintain a First Amendment retaliation claim, a private citizen complainant must allege that the defendant took some action in response to his or her First Amendment activity that 'effectively chilled the exercise of his First Amendment right'" (quoting *Williams*, 535 F.3d at 76)). Plaintiff A.O. and her parents continued to complain to the District about A.O.'s treatment by students and faculty after they filed the notice of claim. *See* Dkt. No. 64-65 at ¶¶ 157-159; Dkt. No. 73 at ¶¶ 157-159. Specificall, admit the following allegations: (1) "After they served their notice of claim, Amy Oliveras continued to meet with the District officials and continued to complain to Ms. Rockhill, Ms. Kenyon, Mr.

Ellsworth, and Ms. Black about students' behavior toward A.O. and A.O.'s treatment by the District;" (2) "A.O. also continued to complain to District Officials about her treatment by other students and by teachers and administrators in the District after the notice of claim was served;" and (3) "Even Mr. Oliveras met with Mrs. Kenyon about A.O.'s educational progress and her disciplinary actions after Plaintiffs served the notice of claim." Dkt. No. 73 at ¶¶ 157-159. As such, the Court finds that Plaintiffs have failed to establish that their speech was chilled as a result of Defendants' conduct.

In *Karlen v. Landon*, the plaintiffs brought claims against the Westport Board of Education alleging violations under Title VI and the Equal Protection Clause of the Fourteenth Amendment, as well as a claim of First Amendment retaliation. *See Karlen v. Landon*, 503 Fed. Appx. 44, 45 (2d Cir. 2012). On appeal, the plaintiffs argued that "no chilling need be shown where there is other 'tangible injury.'" *Id.* at 48. Disagreeing with the plaintiffs, the Second Circuit held that, "*Gill v. Pidlypchak*, 389 F.3d 379 (2d Cir. 2004), on which Karlen relies, recognized in *dicta* that in two prior cases involving allegedly retaliatory zoning determinations, we had not insisted upon a chilling to maintain a First Amendment retaliation claim. . . . But this case involves no comparable tangible injury. As we have recently reaffirmed, '[d]espite these limited exceptions, as a general matter, First Amendment retaliation plaintiffs must typically allege "actual chilling."'" *Id.* (quotation and internal citation omitted); *see also Avgerinos v. Palmyra-Macedon Cent. Sch. Dist.*, 690 F. Supp. 2d 115, 132 (W.D.N.Y. 2010) (discussing the exceptions set forth in *Gill* and explaining why they did not apply in that case).

Since Plaintiffs have failed to put forth any evidence demonstrating that their speech was actually chilled, Defendants' motions for summary judgment as to this claim is granted.

Even if the Court accepts Plaintiffs' argument that actual chilling effect is not required in the present matter because they have established some other, independent harm, *i.e.*, "the

emotional and physical harm to Plaintiff A.O., including suicidal statements, and the disruption to the Oliveras' family life[,]" Plaintiffs' claim still fails. Dkt. No. 75 at 26. Specifically, Plaintiffs have failed to establish that Defendants' "'conduct was motivated by or substantially caused by [plaintiffs'] exercise of free speech.'" *Gill*, 389 F.3d at 383 (quotation omitted).

Plaintiffs claim that "[t]here were 12 'student referral[s]' between September 24, 2010 and October 29, 2010." Dkt. No. 73 at 23. The record, however, makes clear that Plaintiff A.O. was disciplined as a result of her own misbehavior. On one occasion, in September of 2010, Plaintiff A.O. stood on a table during Ms. Leidig's class. Ms. Leidig then reported this to Defendant Kenyon and Plaintiff A.O. was issued work study as a result. *See* Dkt. No. 62-15 at 19. Plaintiff Amy Oliveras agreed that the discipline was appropriate. *See id.* Moreover, Plaintiff A.O. admitted that she was chewing gum in gym class and that it was against the rules; Plaintiff Amy Oliveras simply believed that it was not necessary to send a letter home for such a minor infraction. *See id.* at 19-20.

On or about October 21, 2010, Plaintiff A.O. received lunch detention from Ms. Leidig. *See* Dkt. No. 73 at ¶ 107. Plaintiff A.O. did not attend the lunch detention, however, and when Mr. Ellsworth requested that she come to his office, she refused to do that as well. *See id.* at ¶ 108. Defendants contend that Mr. Ellsworth then went directly to Plaintiff A.O.'s Spanish class, removed her from the class and spoke to her in the hallway about her attitude. *See id.* Defendants, however, deny that Mr. Ellsworth "spoke" to her in the hallway. *See id.* Rather, they contend that "Mr. Ellsworth screamed at A.O. that 'out of 300 something kids, [A.O.] is the only one who is disrespectful' and that he 'didn't care what happened to [A.O.] in the past.'" *Id.* (citation omitted). Plaintiffs contend that Plaintiff A.O. did not go to the office because she was scared of Mr. Ellsworth and that "Mr. Ellsworth was so loud, the Spanish teacher needed to close the door because he was disturbing the class." *Id.* (citation omitted). Even when viewed in light

most favorable to Plaintiffs, the record is clear that Plaintiff was disciplined because she failed to attend lunch detention.

Thereafter, when Plaintiff A.O. reentered her Spanish class, Defendant Kenyon instructed Plaintiff A.O. to apologize for slamming the door during class, as it caused a disruption. *See* Dkt. No. 62-15 at 20. Plaintiff A.O. admits that the door closed faster than she intended and caused a loud noise. However, Plaintiff A.O. claimed that she had already apologized and felt that Defendant Kenyon making her apologize again at the end of the class was simply done to single her out and embarrass her. *See id.*

The evidence makes clear that Defendants disciplined and/or reprimanded Plaintiff A.O. for her own misconduct, which has been well-document throughout the record. Further, Plaintiffs have admitted to many of the instances of misconduct, but have simply tried to downplay the significance of the incident. As such, Plaintiffs have failed to establish that Defendants' "'conduct was motivated by or substantially caused by [plaintiffs'] exercise of free speech.'" *Gill*, 389 F.3d at 383 (quotation omitted); *see also Holmes v. Poskanzer*, 342 Fed. Appx. 651, 653 (2d Cir. 2009) (holding that because the plaintiff's conduct would "'no doubt subject him to disciplinary action[,]'" he "cannot show that retaliation was the but-for cause of the discharge") (citing *Lowrance*, 20 F.3d at 534-35).

Based on the foregoing, the Court grants Defendants' motions for summary judgment as to Plaintiffs' First Amendment retaliation claim.


### 3. *Monell* Liability

"Although municipalities are within the ambit of section 1983, municipal liability does not attach for actions undertaken by city employees under a theory of *respondeat superior*." *Birdsall v. City of Hartford*, 249 F. Supp. 2d 163, 173 (D. Conn. 2003) (citing *Monell v. New*

*York City Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691, 98 S. Ct. 2018, 2036 (1978)).  Despite the fact that *respondeat superior* liability does not lie, a municipal entity or employee sued in his or her official capacity can be held accountable for a constitutional violation which has occurred pursuant to "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the municipality's] officers . . . [or] pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels." *Monell*, 436 U.S. at 690-91.  Such municipal liability can be established in a case such as this in several different ways, including through proof of an officially adopted rule or widespread, informal custom demonstrating "a deliberate government policy or failing to train or supervise its officers." *Bruker v. City of New York*, 337 F. Supp. 2d 539, 556 (S.D.N.Y. 2004) (quoting *Anthony v. City of New York*, 339 F.3d 129, 140 (2d Cir. 2003)).  A plaintiff may also show that the allegedly unconstitutional action was "taken or caused by an official whose actions represent an official policy," or when municipal officers have acquiesced in or condoned a known policy, custom, or practice.  *See Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir.), *cert. denied sub nom., County of Schenectady v. Jeffes*, 531 U.S. 813, 121 S. Ct. 47 (2000); *Wenger v. Canastota Cent. Sch. Dist.*, No. 5:95-CV-1081, 2004 WL 726007, *3 (N.D.N.Y. Apr. 5, 2004).

In the present matter, since the Court has found Plaintiffs fail to establish a triable issue of fact as to any individual Defendant's liability under section 1983 for unconstitutional conduct, *a fortiori*, they cannot establish that a policy or practice of the District caused any such constitutional violation.  *See Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (holding that "[i]f a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point"); *see also Rutigliano v. City of New York*, 326 Fed. Appx. 5, 9 (2d

42

Cir. 2009) (affirming summary judgment dismissal of the plaintiff's *Monell* claim where the court dismissed all of the plaintiff's section 1983 claims); *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (observing that there must be an underlying constitutional violation to support a *Monell* claim); *Khan v. Ryan*, 145 F. Supp. 2d 280, 285 (E.D.N.Y. 2001) (same).

Although "there are limited exceptions to this rule where the injuries complained of are not solely attributable to the actions of named individual defendants, or where a jury concludes that the individual defendants violated plaintiff's rights but nonetheless enjoy qualified immunity, neither of these exceptions applies here." *Bonilla v. Jaronczyk*, 354 Fed. Appx. 579, 582 (2d Cir. 2009) (internal quotation marks and citations omitted); *see also Rutigliano*, 326 Fed. Appx. at 9 (observing that a municipality may be found liable under section 1983 even in the absence of individual liability "only in very special circumstances" (citing *Barrett v. Orange County Human Rights Comm'n*, 194 F.3d 341, 350 (2d Cir. 1999) (holding that the district court should have permitted the jury to decide whether the municipal defendants were liable irrespective of the liability of the individual defendants where there was evidence that a multi-member commission may have violated the plaintiff's First Amendment rights)).

Since the Court has found that none of the individual Defendants' violated any of Plaintiffs' constitutional rights, and because the alleged injuries were solely attributable to the named individual Defendants, the Court grants Defendants' motions for summary judgment as to the remaining individual and municipal Defendants.

### E.      Claims brought by Plaintiffs Amy and Hiram Oliveras

Defendants contend that the claims brought by Plaintiffs Amy and Hiram Oliveras must be dismissed because the only harms they have alleged are the alleged violations of Plaintiff A.O.'s constitutional and statutory rights.  *See* Dkt. No. 60-1 at 7; Dkt. No. 62-2 at 13-14; Dkt.

No. 64-66 at 32.  The Court agrees.

Although parents may sue on behalf of their minor child, they do not have standing to assert claims on their own behalf for a violation of their child's rights.  *See  T.P. v. Elmsford Union Free Sch. Dist.*, No. 11–CV–5133, 2012 WL 860367, *3 (S.D.N.Y. Feb. 27, 2012) (stating that "Section 1983 does not recognize a claim on behalf of one person arising from a violation of another person's rights" and holding that a plaintiff-parent "cannot recover on any derivative claim based on a Section 1983 civil rights or Title IX violation simply because she is [child's] mother"); *see also JG & PG ex rel. JGIII v. Card*, No. 08 Civ. 5668, 2009 WL 2986640, *6 (S.D.N.Y. Sept. 17, 2009) ("Plaintiff–Parents do not have standing to sue on their own behalf for violation of Plaintiff–Children's constitutional rights"); *Morgan v. City of New York*, 166 F. Supp. 2d 817, 819 (S.D.N.Y. 2001) (holding that a parent lacks standing to bring individual claims under Section 1983 for deprivation of the daughter's constitutional rights).

Based on the foregoing, the Court grants Defendants' motions for summary judgment as to the claims brought by Plaintiffs Amy and Hiram Oliveras.


**F.**     **Plaintiffs' motion to amend their complaint**

"Plaintiff A.O. seeks to amend her complaint to add Title IX claims based on gender discrimination."  Dkt. No. 76 at ¶ 22.  Plaintiffs claim that "Defendants will not be prejudiced nor will amendment cause any unwarranted delay as the Defendants have had extensive discovery involving both race and gender harassment and bullying."  *Id.*  Plaintiffs further argue that Defendants will not be prejudiced because the law governing Title VI and Title IX claims are the same.  *See id.*; *see also* Dkt. No. 75 at 31-35.  Plaintiffs argue that amendment is appropriate under Rule 15 of the Federal Rules of Civil Procedure, which instructs courts to permit amendment of pleadings "freely."  *Id.*  Defendants, however, argue that Plaintiffs' cross-motion to

amend should be denied as untimely and prejudicial. *See* Dkt. No. 89-2 at 13-16; *see also* Dkt.

No. 87 at 10-13. They argue that Plaintiffs have offered no excuse for their delay. *See id.*

Further, discovery has been closed since April 1, 2013 and it would need to be reopened if the

Court grants Plaintiffs' motion. *See id.* at 15; Dkt. No. 87 at 12-13. Finally, Defendants argue

that amendment would be futile because Plaintiffs have failed to allege sufficient facts to support

such a claim. *See id.*

Leave to amend should be "freely give[n] . . . when justice so requires." Fed. R. Civ. P.

15(a)(2). Notwithstanding this lenient standard, the decision to grant or deny leave to amend is

within the discretion of the district court. *See Foman v. Davis*, 371 U.S. 178, 182 (1962). A

district court may properly deny leave to amend for "undue delay, bad faith or dilatory motive on

the part of the movant, repeated failure to cure deficiencies by amendments previously allowed,

undue prejudice to the opposing party by virtue of allowance of the amendment, futility of

amendment, etc." *Id.*; *see also SCS Commc'ns, Inc. v. Herrick Co., Inc.*, 360 F.3d 329, 345 (2d

Cir. 2004) (holding that "under Fed. R. Civ. P. 15(a), leave to amend a pleading may only be

given when factors such as undue delay or undue prejudice to the opposing party are absent").

However, "mere delay is not, of itself, sufficient to justify denial of a Rule 15(a) motion." *Parker

v. Columbia Pictures Indus.*, 204 F.3d 326, 339 (2d Cir. 2000).

"Although Rule 15(a) governs the amendment of pleadings, Rule 16(b) also may limit the

ability of a party to amend a pleading if the deadline specified in the scheduling order for

amendment of the pleadings has passed." *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229,

243 (2d Cir. 2007). Rule 16(b)(4) provides that "[a] schedule may be modified only for good

cause [.]" Fed. R. Civ. P. 16(b)(4). The Second Circuit has held that, where a district court has

set a deadline for amending pleadings, "the Rule 16(b) 'good cause' standard, rather than the more

liberal standard of Rule 15(a), governs a motion to amend filed after the deadline[.]" *Parker*, 204

F.3d at 340; *see also Holmes v. Grubman*, 568 F.3d 329, 334 (2d Cir. 2009).

"A finding of good cause depends on the diligence of the moving party." *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir. 2003) (affirming denial of leave to amend where the plaintiffs delayed more than one year, discovery had been completed and a summary judgment motion was pending). "[T]he good cause standard is not satisfied when the proposed amendment rests on information 'that the party knew, or should have known, in advance of the deadline.'" *Enzymotec Ltd. v. NBTY, Inc.*, 754 F. Supp. 2d 527, 536 (E.D.N.Y. 2010) (citation omitted) (finding that the plaintiff acted with diligence in seeking leave to amend within two months of discovering the facts underlying its new cause of action); *but see Jackson v. Roslyn Bd. of Educ.*, 596 F. Supp. 2d 581, 586 (E.D.N.Y. 2009) (finding that the plaintiff's delay of nearly five months evinced "a lack of diligence").

Although the moving party's diligence is a district court's "primary consideration" in its Rule 16(b) good cause inquiry, the court "also may consider other relevant factors including, in particular, whether allowing the amendment of the pleading at this stage of the litigation will prejudice defendants." *Kassner*, 496 F.3d at 244. An amendment is prejudicial to the non-moving party if it "would 'require the opponent to expend significant additional resources to conduct discovery and prepare for trial' or 'significantly delay the resolution of the dispute.'" *Ruotolo v. City of New York*, 514 F.3d 184, 192 (2d Cir. 2008) (quotation omitted).

In the present matter, the Uniform Pretrial Scheduling Order, issued by Magistrate Judge Hummel, stated that any application to amend a pleading must be made on or before **April 20, 2012**. *See* Dkt. No. 16. Further, discovery was due by December 1, 2012, and then later extended until March 31, 2013. *See id.*; *see also* Dkt. No. 71. Plaintiffs brought their motion to amend on **July 13, 2013**, over fourteen (14) months past the deadline for applications to amend a pleading. As such, Rule 16(b)'s "good cause" standard governs Plaintiffs' motion.

Having reviewed Plaintiffs' motion to amend and the proposed amended complaint, the Court finds that Plaintiffs have failed to establish good cause. As mentioned, Plaintiffs filed their motion to amend over fourteen (14) months past the deadline set for applications to amend a pleading. The facts upon which they seemingly rely were available to them when they first filed this action on September 19, 2011. Discovery has been closed since March 31, 2013. Since this proposed claim relies on gender harassment, as opposed to race-based incidents, discovery would necessarily have to be reopened and Defendants would have to be afforded an opportunity to move for summary judgment as to that claim. In light of the prejudice to Defendants and Plaintiffs clear lack of diligence in pursuing this claim, the Court denies Plaintiffs' motion to amend their complaint.

Moreover, the Court finds that, in the altnerative, amendment of the complaint would be futile. Plaintiff A.O. alleges that, when she was in seventh grade a boy, J.K., an elementary school boy, touched Plaintiff A.O.'s hair and arm while on the bus and told her how sexy she was. *See* Dkt. No. 73 at ¶ 27. Plaintiff Amy Oliveras testified that she called Mr. Dann the following morning to discuss the incident and he informed her that he was going to talk with the bus driver "and he assured me that that would never happen again." Dkt. No. 76-5 at 30. Thereafter, Plaintiff A.O. alleges that a female student, K.A., touched her inappropriately on the breast and thigh during a study hall period. *See* Dkt. No. 73 at ¶ 38. Plaintiff A.O. testified that she reported the incident to Mr. Ellsworth. *See id.* Mr. Ellsworth spoke with the student and gave her a warning. *See id.* This was the first issue Plaintiff A.O. had with K.A. *See id.* at ¶ 40.

Thereafter, Plaintiff A.O. alleged that, while in summer school, K.A. touched her on the bottom while walking behind her in the hallway. *See id.* at ¶ 78. Plaintiff Amy Oliveras spoke to the BOCES teacher and made arrangements so that she (Amy Oliveras) or a teacher would escort Plaintiff A.O. to and from class. *See id.* Plaintiff A.O. did not report any further problems with

47

K.A. during summer school. *See id.* Thereafter, Plaintiff A.O. alleged that K.A. touched her inappropriately during volleyball practice. *See id.* at ¶ 87. Plaintiff A.O. alleges that she reported this conduct to Mr. Ellsworth. *See id.* In response to an email sent by Ms. Black, Mr. Ellsworth indicated that none had reported the incident to him. *See id.*; *see also* Dkt. No. 64-26 at 4. Finally, Plaintiff A.O. alleged that a male student, D.W., threatened to start calling her "titties" during school. *See* Dkt. No. 73 at ¶ 97. Mr. Ellsworth, as well as Mrs. Rockhill investigated the allegation by interviewing the students that Plaintiff A.O. alleged were involved. *See id.*

"Because Title VI and Title IX use parallel language, we construe them similarly." *DT v. Somers Cent. Sch. Dist.*, 348 Fed. Appx. 697, 699 n.2 (2d Cir. 2009) (citing *Barnes v. Gorman*, 536 U.S. 181, 185, 122 S. Ct. 2097, 153 L. Ed. 2d 230 (2002); *Curto v. Edmundson*, 392 F.3d 502, 504 n.3 (2d Cir. 2004)). "Sexual harassment is considered discrimination in the school context under Title IX, and a plaintiff may recover for student on student harassment, if the plaintiff can demonstrate" the following four elements:

> (1) defendant is a Title IX funding recipient;
>
> (2) an appropriate person has actual knowledge of the discrimination or harassment the plaintiff alleges occurred;
>
> (3) the funding recipient has acted with deliberate indifference to known acts of harassment; and
>
> (4) the discrimination is so severe, pervasive and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit.

*McGrath v. Dominican Coll. of Blauvelt, N.Y.*, 672 F. Supp. 2d 477, 486 (S.D.N.Y. 2009) (citing *Williams v. Bd. of Regents of the Univ. Sys. of Georgia*, 477 F.3d 1282, 1293 (11th Cir. 2007)). "Courts will find deliberate indifference where a plaintiff demonstrates that the school's response to the harassment or its lack of response is 'clearly unreasonable in light of the known circumstances.'" *Id.* at 486-87 (quoting *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 648,

119 S. Ct. 1661, 143 L. Ed. 2d 839 (1999)).

In the present matter, the proposed Title IX claim would fail for the same reasons that Plaintiffs' Title VI claim was dismissed. The isolated incidents were "not so severe, pervasive, and objectively offensive that they could reasonably be said to deprive [Plaintiff A.O.] of access to educational opportunities or benefits provided by the school." *Brodsky ex. rel. S.B. v. Trumbull Bd. of Educ.*, 2009 WL 230708, *5-*6 (D. Conn. Jan. 30, 2009) ("Plaintiffs have alleged that S.B. was subjected to name-calling and insults, had a straw thrown at her, had a pencil stuck under her butt, had her butt slapped by J .S. at the Brodsky home while the girls were still friends, and on one occasion, had her breasts and/or buttocks touched by J.S. in the hallway at school without S.B.'s consent. While inappropriate and not to be condoned, these actions collectively are not so severe, pervasive, and objectively offensive that they could reasonably be said to deprive S.B. of access to the educational opportunities or benefits provided by the school"). Moreover, "'[t]he Supreme Court in Davis recognized that children are not like adults and often engage in behavior that adults would find inappropriate and offensive,'" without such behavior necessarily being actionable. *Riccio v. New Haven Bd. of Educ.*, 467 F. Supp. 2d 219, 224-225 (D. Conn. 2006) (citing *Davis*, 526 U.S. at 652).

Even assuming *arguendo* that a reasonable jury could find that the alleged harassment was sufficiently severe and pervasive and was based upon sex, Plaintiffs' Title IX claim nonetheless fails to survive summary judgment because Defendants were not deliberately indifferent to the instances of alleged harassment that were reported to them by Plaintiffs or which were otherwise known to Defendants. As discussed in the context of Plaintiffs' Title VI claim, Defendants responded in a reasonable manner to the alleged incidents of harassment. The fact that Plaintiffs may not have been satisfied with their investigation and/or eventual actions taken does not render Defendants' conduct "clearly unreasonable." As such, the Court finds that,

in the alternative, amendment of the complaint would be futile.

Based on the foregoing, the Court denies Plaintiffs' motion to amend their complaint.

## G. Plaintiffs' state law claims

In their complaint, Plaintiffs contend that Defendants violated their rights to be free from racial discrimination guaranteed by the New York State Human Rights Law and that Plaintiffs were retaliated against for their opposition to said discrimination. Further, Plaintiffs have asserted claims of negligence and gross negligence. *See* Dkt. No. 1.

Application of supplemental jurisdiction is discretionary, and "it requires a balancing of the considerations of comity, fairness to the litigants, judicial economy, and the avoidance of needless decisions of state law." *Federman v. Empire Fire & Marine Ins. Co.*, 597 F.2d 798, 809 (2d Cir. 1979) (citation omitted). The Second Circuit has held that "'if [all] federal claims are dismissed before trial . . . the state claims should be dismissed as well.'" *Castellano v. Bd. of Trustees*, 937 F.2d 752, 758 (2d Cir. 1991) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966)).

Since the Court has dismissed all of Plaintiffs' federal claims, it declines to exercise supplemental jurisdiction over their state-law claims and dismisses them without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

## H. Defendant Goldman's request for attorney's fees

Defendant Goldman asserts that he is entitled to attorney's fees as a prevailing party pursuant to 42 U.S.C. § 1988. *See* Dkt. No. 60-1 at 15. Specifically, Defendant Goldman argues that, "[i]n evaluating this application, it should be noted that Mr. Goldman, through counsel, requested that plaintiffs voluntarily discontinue their claims against [him]. This request was due

to the fact that there is not a single factual allegation of conduct on the part of Mr. Goldman that would support plaintiffs' contentions, and the plaintiffs testified clearly and unequivocally that they were satisfied with the manner in which Mr. Goldman conducted himself in connection with this matter. The plaintiffs refused to discontinue, requiring the present motion by Mr. Goldman." *Id.*

"Attorney's fees may be awarded to a successful defendant in a civil rights action pursuant to 42 U.S.C. § 1988 where the underlying claim is 'frivolous, unreasonable, or groundless, or . . . the plaintiff continued to litigate after it clearly became so.'" *Ehrlich v. Incorporated Vill. of Sea Cliff*, 389 Fed. Appx. 59, 61 (2d Cir. 2010) (quoting *Rounseville v. Zahl*, 13 F.3d 625, 632 (2d Cir. 1994)). "Though a showing that the plaintiff acted in bad faith will further support an award under section 1988, the determination generally turns on whether the claim itself is clearly meritless." *Id.* "A claim is frivolous when it lacks an arguable basis either in law or in fact." *Shakur v. Selsky*, 391 F.3d 106, 113 (2d Cir. 2004) (internal quotation marks omitted). "The determination as to whether a claim was frivolous, unreasonable, or groundless is not a purely factual inquiry. . . . Thus, such a determination is ordinarily reviewed . . . for abuse of discretion." *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 765, 770 (2d Cir. 1998).

The Second Circuit has cautioned that:

> Certain types of judicial rulings strongly indicate that a plaintiff's claim should not be deemed frivolous. . . . For example, a court cannot properly consider a claim to be frivolous on its face if it finds that the plaintiff must be allowed to litigate the claim. Nor may a claim properly be deemed groundless where the plaintiff has made a sufficient evidentiary showing to forestall summary judgment and has presented sufficient evidence at trial to prevent the entry of judgment against him as a matter of law.

*Id.* at 770-71 (internal citations omitted).

In the present matter, the Court denies without prejudice to renew Defendant Goldman's

request for attorney's fees.  Although Defendant Goldman may be able to establish that he is entitled to an award of attorney's fees, the Court declines to grant such an award at this time.  If Defendant Goldman, or any other named Defendant, wishes to pursue such a claim, they may file their motion within fourteen (14) days after the entry of judgment.  *See* Fed. R. Civ. P. 54(d)(2)(B).  Any such motion must be in conformance with the Federal and Local Rules.  *See, e.g.*, Fed. R. Civ. P. 54(d)(2)(B).[12]

Based on the foregoing, the Court denies without prejudice Defendant Goldman's request for attorney's fees.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motions for summary judgment (Dkt. Nos. 60, 62 & 64) are **GRANTED**; and the Court further

**ORDERS** that Plaintiffs' cross-motion to amend is **DENIED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that any application for attorneys' fees and cost must be submitted within **FOURTEEN (14) DAYS** from the date of judgment; and the Court further

---

[12] The Court notes that three different law firms represented the various Defendants named in this action.  Although it is often necessary because of conflicts that may arise between the individual defendants, it is unclear to the Court why such an arrangement would have been necessary in the present matter.  In fact, the arguments made by the named Defendants in support of their motions for summary judgment were substantially similar.  As such, Defendants should be prepared to address why any fees they seek are reasonable in light of these considerations.

**ORDERS** that the Clerk of the Court shall serve a copy of this Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: March 31, 2014
      Albany, New York

Mae A. D'Agostino
U.S. District Judge
